Harold L. FAUBION, Appellant,

v.

SWIFT ADHESIVES CO., Respondent,

and

Treasurer of Missouri as Custodian of
2nd Injury Fund, Respondent.

No. WD 48104.

Missouri Court of Appeals,
Western District.

Feb. 1, 1994.

Donald C. Pierce, St. Joseph, for Faubion.

Kip A. Kubin, Overland Park, KS, for Swift Adhesives Co.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Reginald Harrington, Asst. Atty. Gen., Kansas City, for Treasurer of Missouri.

Before LOWENSTEIN, P.J., and TURNAGE and FENNER, JJ.

FENNER, Judge.

Appellant, Harold L. Faubion, appeals the decision of the Labor and Industrial Relations Commission (Commission) affirming the findings of the Administrative Law Judge (ALJ) in this workers' compensation case. The ALJ determined that Faubion was not permanently and totally disabled as a result of a work-related accident on March 31, 1988, and awarded Faubion compensation for his permanent partial disability.

The award was against Faubion's employer-insurer and the Treasurer of the State of Missouri as custodian of the Second Injury Fund.[1] The ALJ ordered Faubion's employer-insurer to pay to Faubion 123.2 weeks of compensation at the rate of $161.89 per week for a total of $19,944.85. The ALJ further found the Second Injury Fund to be liable and ordered the Treasurer of the State of Missouri to pay to Faubion 12.3 weeks of compensation at the rate of $161.89 per week for a total of $1991.25. As stated above, the Commission affirmed the ALJ's award.

There is no dispute that Faubion was injured on March 31, 1988 during the course of his employment at Swift Adhesives Company (Swift),[2] and that Faubion timely filed a claim for compensation.

On appeal, Faubion asserts that there was no competent and substantial evidence to support the Commission's determination that Faubion was not permanently and totally disabled as a result of his accident at Swift. Faubion further argues on appeal that the Commission relied upon the expert medical testimony of Dr. Andrew McCanse, who was not a credible witness, in reaching its conclusion that Faubion was not permanently and totally disabled, and therefore its decision was not supported by competent and substantial evidence.[3]

An appellate court may set aside the decision of the Commission only if the findings of the Commission are clearly contrary to the overwhelming weight of the evidence or no competent and substantial evidence supports the decision. *Gudde v. Heiman Grain, Inc.*, 830 S.W.2d 574, 576 (Mo. App.1992). This court reviews workers' compensation cases in the light most favorable to the Commission's decision and upholds the decision if it is supported by competent and substantial evidence on the whole record. *Rector v. City of Springfield*, 820 S.W.2d 639, 640 (Mo.App.1991) (en banc). Further, this court must disregard evidence unfavorable to the Commission's decision even though a

---

1. Both Swift Adhesives Company, Faubion's employer, and the State Treasurer as custodian of the Second Injury Fund are respondents in this appeal. In the Second Injury Fund's brief, the first point essentially asserts that the Second Injury Fund should not have been found liable for Faubion's injury because the evidence failed to show that Faubion suffered from a pre-existing industrial disability. The second point merely states that the ALJ's finding that Faubion is not permanently and totally disabled was supported by substantial evidence.

   As to its first point, the State Treasurer as custodian of the Second Injury Fund has not filed an appeal in this case, and we will not consider additional points of error raised in its brief as respondent. When only one party appeals, review is limited to the contentions made by that party, and allegations of error raised by a

respondent will not be considered. *Sisco v. James*, 820 S.W.2d 348, 352 (Mo.App.1991) (citations omitted).

2. Swift's liability under the Missouri Workers' Compensation law was insured by Zurich American Insurance Company.

3. Appellant, in his brief, divides his arguments into two separate points, one focusing on the testimony of Dr. Andrew McCanse and the other focusing on the evidence as a whole. Because the two points actually address the same issue, that is, whether the evidence was competent and substantial to support the Commission's determination, we will address the points together in this opinion.

finding by the Commission to the contrary would have been supported by the evidence. *Id.* In resolving issues concerning credibility of witnesses, we defer to the Commission who is charged with the responsibility of passing upon the credibility of all the witnesses. *Mashburn v. Tri–State Motor Transit Co.*, 841 S.W.2d 249, 250 (Mo.App.1992).

Section 287.020.7, RSMo Supp.1993 provides:

The term "total disability" as used in this chapter shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident.

In other words, total disability means the inability to return to any reasonable or normal employment. *Isacc v. Atlas Plastic Corp.*, 793 S.W.2d 165, 166 (Mo.App.1990). The test for permanent total disability is whether, given the employee's situation and condition, he is competent to compete in the open labor market. *Id.* This test measures the worker's prospects for returning to employment. *Id.* The central question is whether any employer in the usual course of business would reasonably be expected to employ the employee in his present physical condition. *Id.*

A hearing was held before the ALJ on September 22, 1992. The evidence, viewed in the light most favorable to the Commission's decision, revealed the following: Faubion was 67 years old at the time of the hearing, with a high school education and one year of college education. Faubion testified that he started working at Swift in December of 1978. His duties included making, barrelling, and shipping glue. After making the glue, he would cart it off in fifty-five gallon barrels weighing about six hundred pounds each. Until he could get the barrels on a truck, he would manually handle the barrels. Faubion continued to do this work until his accident on March 31, 1988.

Faubion testified that prior to his accident in March of 1988, he had had knee problems and extensive knee surgery. In 1984, he went to see Dr. William Gondring who performed arthroscopic surgery on his left knee. In December of 1984, Faubion had a complete left knee replacement which was performed by Dr. Gondring. This was necessitated by arthritis. Faubion returned to his job at Swift after the surgery and was able to perform his job duties as before. The problems in his right knee eventually worsened, and in the fall of 1987 Dr. Gondring performed a complete right knee replacement on Faubion, which was also necessitated by arthritis. Faubion returned to work after the right knee replacement, in February of 1988, and was able to perform all his job duties. He testified that he had no limitations.

On March 31, 1988, Faubion was loading a truck and he hit something on the dock while he was pulling a barrel backwards. He apparently fell underneath the barrel. When he stood up, he could not walk backwards, but could only walk forward. He suspected that he broke something, but managed to finish out his day with the help of a co-worker. Faubion stated that when he got home that day, he was experiencing a lot of pain in both of his knees. He called Dr. Gondring's office and they sent him pain killers. The day following the accident was Good Friday and Faubion did not have to work. By Sunday, Faubion was unable to walk without the assistance of a walker.

Almost two weeks after the accident, on April 12, 1988, Faubion had a regularly scheduled visit with Dr. Gondring who told Faubion to stay off his feet and to stay home from work. Faubion's x-rays revealed that he had fractured both of his knees. Faubion continued to see Dr. Gondring on a regular basis, and in June of 1988, Dr. Gondring made arrangements for Faubion to see Dr. David Stulberg, the inventor of the artificial knee, in Chicago. In August of 1988, Dr. Stulberg, with Dr. Gondring's assistance, performed a total right knee revision on Faubion, removing the old right knee prosthesis and replacing it with a new prosthesis. Faubion testified that after the surgery, he was on a walker for awhile and then on a cane. He stated that he was doing fine until January of 1989 when his right kneecap separated. He went to see Dr. Gondring who replaced his right kneecap. A couple of days after the surgery, Faubion developed an in-

fection of the prosthesis in his right knee. Dr. Gondring operated again in March of 1989.

Faubion testified that he has not worked since his accident. Since March of 1989, he has had to use a walker to get out of bed, he usually walks with a cane, he cannot walk up steps, he cannot kneel, and he cannot stand still. He stated that since his accident, he can walk about one block up and back and he can drive to the grocery store. He goes to the YMCA for an hour five days a week to exercise in the pool. He also mows his lawn on his riding mower. His physical problems are only in connection with his knees.

Dr. Bernard Abrams testified by deposition. Dr. Abrams examined Faubion at the request of Faubion's attorney. Dr. Abrams specializes in neurology and is board certified. After examining Faubion on May 17, 1991, it was Dr. Abrams' opinion that Faubion had a permanent partial disability or impairment of 50.6 percent. Later in the deposition, Dr. Abrams stated that, in his opinion, Faubion was permanently and totally disabled as a result of his injury on March 31, 1988. However, Dr. Abrams later qualified this statement by saying that he believed that Faubion was permanently and totally disabled from his prior employment, and stated, "I think if you made up a list of functional disabilities for him, I think probably there is some job that he could fit into, I mean some type of sedentary job, but when you take his age, then it gets to be a little bit more difficult to find him a job." Then the following colloquy occurred:

Q [attorney for Swift]: As far as physical requirements then, you think that there are jobs out there that would fall within any physical restrictions Mr. Faubion might have; is that true?

A [Dr. Abrams]: Well, I think there probably are.

Q: You think he could do some types of sedentary employment, true?

A: I think that that's probably true, yes.

Q: And at least to your understanding he is not restricted in any means from using his upper extremities or anything above the knees; is that true?

A: No.

Q: The statement I made was true?

A: The statement you made was true.

\*      \*      \*      \*      \*      \*

Q: Now, if I understand your opinion correctly, you say that based upon his age and other factors that you note you think it's unlikely that he is going to be able to—or it's unlikely that somebody would hire him, but certainly physically he would be capable of doing some jobs, true?

A: Yes.

Dr. Abrams only examined Faubion one time. Furthermore, he was not board certified in the specialty of orthopedics. Dr. Abrams testified that when he examined Faubion in May of 1991, he did not display any cognitive difficulty, he had good motor power, his reflexes were equal on both sides, both knees were able to flex and bend to 90 degrees (out of the normal 150 degrees), there were no sensory abnormalities, and there were generally no problems above the knee level.

Dr. William Gondring, a board certified orthopedic surgeon, testified by deposition. Dr. Gondring stated that Faubion first came into his office in March of 1984 because of left knee pain. He testified to the various surgical procedures that were performed on Faubion's left and right knees, as set forth in more detail above. Dr. Gondring stated that when he examined Faubion on April 12, 1988, after his accident, he aspirated blood from Faubion's right knee and knee joint which signalled an acute injury. He x-rayed both knees which showed a fracture of the left knee. He put Faubion's left knee in a knee immobilizer and treated the right knee which also had fractured. He saw Faubion thereafter on a fairly regular basis.

In January of 1990, Dr. Gondring rated Faubion and determined that Faubion "was completely disabled and unable to return to work, and disabled from the standpoint of returning to his former job." Dr. Gondring stated, "[T]he whole man is roughly 50 percent impaired. From the standpoint of his job, his usual and customary vocation for which he had been trained, he was completely disabled from that." Dr. Gondring later

added, "[Faubion] is completely disabled totally from the standpoint of his usual and customary job and that involves being a dock worker at Swift.... And from that job he is totally permanently disabled and actually from almost any job, because he has a great deal of difficulty with walking. He uses a cane now and has pain and limps."

On cross-examination of Dr. Gondring, the following colloquy occurred:

Q [attorney for Second Injury Fund]: There is no reason why Mr. Faubion should not be able to perform sedentary work at this time; isn't that true?

A [Dr. Gondring]: He would be able to do a sit-down job.

Q: For example, there is no reason he couldn't be a cashier in a self-service gas station or parking lot; is that true?

A: He could do that.

Q: Or he could work as a motel or hotel clerk on a night shift, wouldn't that be a fair statement?

A: That would be correct.

Dr. Gondring's office notes from November of 1991, which described Faubion's condition, indicate as follows:

Radiographs of the left knee demonstrates the fracture of the superior pole of the patella appears to have healed and looks satisfactory. The revision, on the right, appears to look quite good and doesn't appear to be any loosening. Lateral view of the right knee looks satisfactory. Gait demonstrates a hesitant gait. He is able to walk on his tiptoes hesitantly, wide-based. He is able to walk on his heels backwards. Relates they constantly hurt, right more than the left. He has flexion back to about 130 degrees with crepitus with motion. Left has good stability, flextion [sic] back to about 125–130 degrees. Slight crepitus.

Dr. Andrew McCanse testified by deposition. Dr. McCanse stated that he has practiced general surgery for 22 years and, for the past nine years, has specialized in occupational medicine. He stated that in the course of his practice, he has been called upon to give evaluations of permanent disabilities.

At the request of the attorney for the Second Injury Fund, Dr. McCanse examined Faubion on August 20, 1991. Dr. McCanse obtained a complete medical history from Faubion which he recounted in his deposition. Dr. McCanse testified that he reviewed all of the relevant medical records and reports concerning Faubion's condition, and took them into account in arriving at his evaluation of Faubion's disability. The results of Dr. McCanse's examination of Faubion on August 20, 1991 were as follows:

The examination of the left knee showed a healed longitudinal incision on the front of the knee. He was able to extend the left knee to 180 degrees—that is completely straightened out—and also to flex it to an acute angle of about 70 degrees. There was no point tenderness on the left knee and there was a little pain on the lateral aspect of the knee on rotary motions of the leg.

Examination of the right knee revealed a healed anterior longitudinal incision extending from the lower thigh down to the lower tibia. There was evidence of a skin graft on the anterior surface of the leg. The right knee extension was to 180 degrees flexion to 80 degrees at an acute angle. There was no particular pain complaint when I extended or flexed his right knee although he did say it bothered him to do motion.

Dr. McCanse's diagnosis was that Faubion had a history of bilateral total knee replacement secondary to degenerative joint disease of both knees and that he had symptomatic knee symptoms following his knee surgery. Dr. McCanse testified that, in his opinion, Faubion "had a permanent partial disability of his right knee as a result of the injury of March 31, 1988, of 50 percent of the right lower extremity based at the knee." Dr. McCanse stated that he believed that Faubion "is capable of performing work in which he has limited standing and walking and sitting 75 percent of the time," like cashier-type work. Dr. McCanse did not believe that Faubion was permanently and totally disabled. In his deposition, Dr. McCanse stated that his opinion was based on the following:

Mr. Faubion gets around amazingly well for a man as large as he is. He walks with a cane, which he had when he was exam-

ined by me. He complains of pain when I move his knees but not anywhere near what I would expect with a person who has a chronic knee pain of several years' duration which is keeping him from working, and my opinion is that he could probably do a working job in which he was standing even 50 percent of the time, that I believe it's beneficial because of his knee replacements that he stand at a minimum part of the time. That's why I rated him at a 75 percent recommendation for sitting rather than 50 percent.

Dr. McCanse testified that he took into account Faubion's age in arriving at his opinion that Faubion was not permanently and totally disabled.

Appellant argues that Dr. McCanse was not a credible witness and that the Commission should not have relied on his testimony. In regard to appellant's credibility argument, this court defers to the Commission on matters of witness credibility. Furthermore, contrary to appellant's assertion, the Commission did not rely solely on Dr. McCanse's testimony. The Commission adopted the ALJ's findings which set out in detail the testimony of Faubion, Dr. Abrams, Dr. Gondring, and Dr. McCanse. The ALJ's findings clearly indicate that all of the physicians' opinions were taken into consideration in determining whether Faubion was permanently and totally disabled. The Commission was allowed to weigh the testimony of the various witnesses and find one witness's testimony to be more credible and reliable than another's.

The record indicates that Faubion was capable of performing certain types of work and was competent to compete in the open labor market. After reviewing the record, we find that the Commission's determination that Faubion was not permanently and totally disabled was based on competent and substantial evidence.

The decision of the Commission is affirmed.

All concur.