Thomas **QUILTY**, Respondent,

v.

**FRANK'S FOOD MART**, Defendant,

**CNA**, Respondent,

and

**National American Insurance Company**, Appellant.

No. WD 49124.

Missouri Court of Appeals, Western District.

Dec. 27, 1994.

American to pay for Thomas Quilty's medical expenses for a back injury. National American asserts that it is not responsible for Quilty's expenses because it was not the workers' compensation insurance carrier when Quilty's on-the-job accident occurred. We agree and reverse the commission's decision.

Quilty worked at Frank's Food Mart as produce manager. In November 1988, he injured his back by lifting a sack of potatoes at the food store. Quilty consulted John Yost, an orthopedic surgeon, who diagnosed Quilty's problem as two ruptured discs and a pinched nerve. Yost performed surgery (a lumbar laminectomy and a disc excision) on Quilty's back in June 1989. He removed bone from the third lumbar vertebra to the sacrum and partially removed the L4–L5 disc and the L5–S1 disc. Yost dismissed Quilty from treatment in December 1989. Yost told Quilty to return for treatment only on an "as needed" basis. Quilty returned to work, but he continued to have some symptoms. He did not seek medical treatment for these symptoms.

On April 1, 1990, Quilty cleaned the store's display cases for three to five hours. The work required Quilty to bend over continuously. As he cleaned the cases, he noticed pain in his lower left side and leg. Later in the day, the pain increased and continued to worsen after he went home.

Quilty waited a month to see Yost again. On May 1, 1990, Yost prescribed epidural shots, stretching exercises and walking. Yost also ordered an MRI and an EMG. These indicated that Quilty had a pinched nerve and a disc fragment resting on the spinal canal. The MRI showed a physical change in Quilty's spine since the surgery as a result of the April 1990 accident. Yost diagnosed Quilty as suffering from a recurrent ruptured disc with extruded disc fragment in the spinal canal and recurrent lumbar radiculopathy.

Yost continued to treat Quilty and noted marked improvement as a result of the three epidural blocks. Yost saw Quilty again on July 24, 1990, and Quilty indicated that he was doing great and had no significant prob-

Bill W. Richerson, Kansas City, for appellant.

Gregory S. Brown, Kristine A. Purvis, Kansas City, for respondent CNA.

James Gordon Lindquist, Kansas City, for respondent Quilty.

Before SPINDEN, P.J., and LOWENSTEIN and ELLIS, JJ.

SPINDEN, Presiding Judge.

National American Insurance Company appeals the Labor and Industrial Relations Commission's decision ordering National

lems. Yost told Quilty to return for treatment only on an "as needed" basis. After this time, Quilty continued to have pain radiating into his left leg and buttocks, but he did not seek treatment.

On March 24 or 25, 1991, Quilty was working at the store when he bent over to pick up a grape from the floor. Quilty felt a sharp pain in his lower back, like a pinch, and he had difficulty straightening up. Quilty described the pain as a quicker onset of pain than he had felt in April 1990.

Yost examined Quilty again on March 25, 1991. Yost diagnosed Quilty as suffering recurrent lumbar radiculopathy. Yost opined, based upon a reasonable degree of medical certainty, that the April 1990 injury caused the ruptured disc fragment and was causing Quilty's present symptoms in 1991. Yost testified, "A fragment of disc does not dissolve." Yost agreed that Quilty's improved condition after the April 1990 injury did not mean that Quilty's pathology had been corrected or improved or that Quilty's ruptured disc with an extruded disc fragment had been cured.

Yost recommended that Quilty receive further diagnostic testing and further medical treatment and care. Quilty, however, did not seek further treatment because Frank's Food Mart's insurance carriers were arguing over who had to pay for the expenses.

For the April 1, 1990, injury, CNA was the workers' compensation insurance carrier for Frank's Food Mart. By March 24, 1991, the store had switched its workers' compensation insurance to National American. Both insurance companies denied liability and claimed that the other was responsible for Quilty's additional medical treatment.

The commission's administrative law judge ruled that National American was responsible, and the commission affirmed her award. National American appeals.

No one disputes Quilty's need for more tests and treatment. The only issue in this case is who should pay for them. National American asserts that the commission erred as a matter of law in affirming the ALJ's

decision that National American should pay because Yost was the only physician who testified and he stated that Quilty's need for further was caused by the incident on April 1, 1990. National American contends that because Frank's Food Mart was insured by CNA on April 1, 1990, CNA should pay. We agree.

 We review workers' compensation cases in the light most favorable to the commission's award and uphold the commission's decision if it is supported by competent and substantial evidence on the whole record. *Phillips v. Ozark Bank,* 803 S.W.2d 662, 663 (Mo.App.1991). We must avoid, however, substituting our judgment upon issues of fact for the commission's judgment. *McFarland v. Bollinger,* 792 S.W.2d 903, 904 (Mo.App. 1990).

 An employee has a right to compensation for a disability resulting from an accident. Section 287.020(2), RSMo 1986, defines "accident." It says:

The word **"accident"** as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury.[1]

In 1983 the Supreme Court of Missouri expanded the scope of the term "accident" in *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781 (Mo. banc 1983). Before *Wolfgeher,* an employee had to show that his or her injury resulted from an abnormal or unexpected event which happened suddenly. In *Wolfgeher,* the Supreme Court declared that an employee had to show only that his injury was "job related." The job related test does not require that the injury result from any unusual or abnormal event. The employee must show only that his or her performance of usual and customary job duties led to a physical breakdown or a change in pathology. *Id.* at 784. "The focus must be on whether 'an injury has occurred rather than what act or force immediately

---

**1.** The General Assembly amended § 287.020(2) in 1993, but that amendment is not applicable to this case because the accidents occurred in 1990 and 1991.

preceded the injury.'" *Rector v. City of Springfield,* 820 S.W.2d 639, 642 (Mo.App. 1991) (citation omitted).

Although the Supreme Court greatly liberalized "accident" to include protracted types of injuries, the burden of proving that the injury was caused by a job related activity or stimulus remains with the employee. The employee "bears the burden of proving that an accident occurred and that it resulted in injury." *Goleman v. MCI Transporters,* 844 S.W.2d 463, 465 (Mo.App.1992). The job related stimulus need not be the sole or direct cause of the injurious result to establish causation. *Tibbs v. Rowe Furniture Corporation,* 691 S.W.2d 410, 412 (Mo.App. 1985). So long as the job related accident is an efficient, exciting, superinducing, concurring or contributing cause, the test for causation is met. *Id.*

"The cause of the injury need not be a single traumatic event; rather, an employee is to be compensated for gradual and progressive injuries which result from repeated or constant exposure to on-the-job hazards." *Rector,* 820 S.W.2d at 642. The employee's work need only be a contributing factor to the injury. *Id.* "[T]he right to compensation should exist if the actual triggering causes are found, on the basis of substantial evidence, to meet the 'job related' or 'work related' test of *Wolfgeher.*" *Wynn v. Navajo Freight Lines, Inc.,* 654 S.W.2d 87, 89–90 (Mo. banc 1983).

The parties do not dispute that Quilty's picking up the grape was job related. The only issue for us to resolve, therefore, is whether Quilty established that his picking up the grape led to a physical breakdown or a change in pathology. *Wolfgeher,* 646 S.W.2d at 784. If it excited, superinduced, or contributed to his injury, it satisfies the causation test. *Tibbs,* 691 S.W.2d at 412.

In her decision, the ALJ concluded:

It is Dr. Yost's opinion that the claimant had a recurrent ruptured disc with an extruded disc fragment in the spinal canal and recurrent lumbar radiculopathy as a result of the April 1, 1990, accident. It was Dr. Yost's opinion that the 1991 accident was a continuation of the affects of the 1990 injury. The MRI and EMG conducted on May 7, 1990, illustrated, in Dr. Yost's opinion, a change in pathology from when Dr. Yost had operated on the claimant's back. In other words, it was Dr. Yost's opinion that there had actually been a physical change in the anatomy of the claimant's spine as a result of the April 1990 accident. Therefore, it was Dr. Yost's opinion that the April 1990 accident was the cause of the claimant's present complaints and his need for further diagnostic testing.... On cross-exam, however, Dr. Yost testified that the March 24, [1991], incident was the "straw that broke the camel's back and brought him to the doctor[.]" ... I find in accordance with Dr. Yost's testimony that the claimant did sustain injury to his low back as a result of the 1990 accident and in fact herniated his disc at that time. Mr. Quilty needed and did obtain treatment from Dr. Yost as a result of this incident. The conservative treatment the claimant underwent was effective and the claimant was released from treatment. He apparently needed no further treatment as he did not return to Dr. Yost until January 1991, when his main complaint was with regard to his chest. I find that it was the effects of the March 24th or 25th, 1991, accident that necessitated claimant's need for further treatment. Mr. Quilty injured his back one day and was seen by Dr. Yost the following day. The symptoms he described as a result of the March 24th or 25th accident were sharp and severe. While Mr. Quilty indeed had a very weak and injured back prior to March 24th, 1991, he did not seek or need further medical treatment for his back until the March 24th accident. I find in accordance with Dr. Yost's testimony that the straw that broke the camel's back was, in fact, the March 24th, 1991, accident. Therefore, National American Insurance Company is responsible for the further treatment which has been recommended by Dr. Yost[.]

The commission adopted the ALJ's decision without comment. We find, however, that the ALJ mischaracterized Yost's testimony

by giving undue significance to a cliché: "the straw that broke the camel's back."

Yost testified:

Q[.] Then it's true, Doctor, that the—it's true that your records would indicate that the reason Mr. Quilty had an increase in pain and did return to your office which effectively ended a nine-month period of work for him was an incident that he described to you on March 24, 1991.

. . . .

A[.] Again, from my record of March 25th, 1991, following my examination, I advised the patient that he was getting pinching of the nerve in his lower back which had been an intermittent problem since he re-injured his back approximately one year ago while working. He had shown symptoms of some discomfort in his back when I had examined him on January 8th, 1991, and he had stated that he had been having back pain for months and was now requiring anti-inflammation medicine. To me, that's not sudden symptoms with one episode, that's the straw that broke the camel's back and brought him to the doctor, which I think is the case with him.

Q[.] So it would be a fair characterization that that final straw occurred March 24, 1991?

A[.] On March, correct.

Yost's testimony was that Quilty's problem was ongoing—that he had not recovered from his previous injuries—when he bent over to pick up the grape from the floor. The "grape incident" was "the straw that broke the camel's back" in the sense it was the event which caused Quilty to return to him for further treatment.

Yost did not testify that the "grape incident" led to a physical breakdown or a change in Quilty's pathology; nor did Yost testify that it excited, superinduced, or contributed to Quilty's injury. To the contrary, Yost maintained throughout his testimony—and the ALJ and commission acknowledged it—that the April 1990 accident caused Quilty's present complaints and his need for further diagnostic testing.

This is not a case, as National American contends, where the commission substituted its own opinion on a medical issue outside the realm of lay understanding. Instead, it is a case where sufficient and competent evidence did not exist for the commission to make its award. Section 287.495.1, RSMo 1986. The commission erroneously relied on Yost's cliché testimony to make its award. The only competent evidence about causation was Yost's testimony that the April 1990 accident was the cause of Quilty's present condition.

Although we recognize that medical testimony is not required to establish cause and disability where those matters are within the understanding of lay persons, *Ford v. Bi–State Development Agency,* 677 S.W.2d 899, 904 (Mo.App.1984), Quilty's back condition was not a matter within a lay person's understanding. The commission erred in concluding, without benefit of expert testimony, that the effects of the March 24 or 25, 1991, accident necessitated Quilty's need for further treatment. The evidence established that the April 1990 accident caused Quilty's present condition. Because the commission's decision as to causation was not supported by sufficient competent evidence, we reverse and remand to the commission with instructions that it enter proper findings concerning the cause of Quilty's injury consistent with this opinion.

